AMERICAN CYANAMID COMPANY,
Petitioner,

v.

FOOD AND DRUG ADMINISTRATION and Joseph A. Califano, Secretary of Health, Education and Welfare et al., Respondents.

No. 77–1969.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1978.

Decided Aug. 21, 1979.

As Amended Aug. 23, 1979.

William R. Pendergast, Washington, D. C., with whom Wayne H. Matelski, Washington, D. C., was on the brief, for petitioner.

Vicki G. Golden, Atty., Dept. of Justice, Washington, D. C., with whom Charles R. McConachie, Atty., Dept. of Justice, Richard M. Cooper, Chief Counsel, and Edward J. Allera, Associate Chief Counsel, Food and Drug Administration, Washington, D. C., were on the brief, for respondents.

Before TAMM, ROBINSON and Mac-KINNON, Circuit Judges.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

On June 3, 1968, the Food and Drug Administration (FDA) approved a new animal drug application (NADA) for Proban, a drug in capsule form manufactured by American Cyanamid Company (Cyanamid) and designed for the control of fleas on dogs.[1] FDA authorized this NADA on a finding that Proban had been shown to be safe and effective for its intended use.[2] FDA attached a qualification to its endorsement of Proban, however, rendering it

1. Letter from Director, Bureau of Veterinary Medicine, to A. Richard Kohler, American Cyanamid Company, (June 3, 1968), Appendix (App.) 141.

2. Proban was approved prior to passage of the Animal Drug Amendments of 1968, Act of July 13, 1968, Pub.L. No. 90–399, 82 Stat. 343. The NADA for Proban was authorized pursuant to the general section of the Food, Drug and Cosmetic Act requiring pre-marketing approval for all "new drug[s]," cf. note 11 infra, presently codified as 21 U.S.C. § 355 (1976).

available only on order of a licensed veterinarian.[3]

Subsequently, Cyanamid researchers conducted tests that in Cyanamid's view demonstrated that Proban could safely be used without the intervention of a veterinarian. Cyanamid submitted the results of these tests, as well as reports of clinical experience, to FDA and requested a supplemental NADA authorizing over-the-counter (OTC) sale of Proban. After considerable delay,[4] the Director of FDA's Bureau of Veterinary Medicine[5] on November 19, 1976, denied approval of the supplement on the basic ground that Cyanamid had not submitted adequate and well-controlled tests demonstrating that Proban could safely be used by consumers without the direction and oversight of a veterinarian.[6] The Director's decision was published in a document styled "Notice of Opportunity for Hearing" (NOH), and in accordance with the agency's regulations[7] it specified that Cyanamid had 30 days within which to request a hearing and to present additional materials in support of its claim that Proban can be safely marketed OTC.[8]

Cyanamid came forward with numerous affidavits of experts disputing the Director's conclusions and buttressing the sought-after change in Proban's status.[9] On September 16, 1977, the Commissioner of FDA issued a final order refusing to approve an NADA for OTC use of Proban and declining to hold a hearing on Cyanamid's request.[10] Cyanamid has petitioned for review of the Commissioner's order and asks us to remand the case to FDA for a trial-type hearing.

3. This restriction was imposed pursuant to a regulation that presently appears at 21 C.F.R. § 201.105 (1978) and provides that, if certain conditions are met,

 [a] drug intended for veterinary use which, because of toxicity or other potentiality for harmful effect, or the method of its use, is not safe for animal use except under the supervision of a licensed veterinarian, and hence for which "adequate directions for use" cannot be prepared, shall be exempt from section 502(f)(1) [21 U.S.C. § 352(f)(1) (1976), which deems to be misbranded any label which does not bear "adequate directions for use"].

4. Cyanamid submitted the supplemental application in suit in 1972. FDA, by letter, stated that the submission was "incomplete." Letter from Myron C. Rosenberg, Bureau of Veterinary Medicine, to Dr. John A. Farnham, American Cyanamid Company (October 22, 1974), App. 134. Cyanamid then notified FDA that a factual "impasse" had been reached and requested FDA to provide a notice of opportunity for hearing. Letter from Dr. John A. Farnham, American Cyanamid Company, to Dr. Myron Rosenberg, Bureau of Veterinary Medicine (February 7, 1975), App. 137–138. FDA did nothing on this matter for another year and one-half, when FDA was informed that Cyanamid had instructed counsel to seek a writ of mandamus compelling FDA to move off dead center. Letter from William R. Pendergast, Counsel for American Cyanamid Company, to Richard A. Merrill, General Counsel FDA (October 7, 1976), App. 139–140. The Director of the Bureau of Veterinary Medicine then issued a notice of hearing. 41 Fed.Reg. 51078 (November 19, 1976), App. 1.

5. The Secretary of Health, Education and Welfare is statutorily charged with the responsibility of ruling on NADAs and supplemental NADAs. 21 U.S.C. § 355 (1976). This authority has been delegated to the Commissioner of Food and Drugs, 21 C.F.R. § 5.1(a) (1978), who in turn has delegated it to the Director of the Bureau of Veterinary Medicine. 21 C.F.R. § 5.83 (1978).

6. 41 Fed.Reg. 51078, App. 1.

7. 21 C.F.R. § 514.200(a) (1978) provides:

 The notice to the applicant of opportunity for a hearing on a proposal by the Commissioner to refuse to approve an application or to withdraw the approval of an application will specify the grounds upon which he proposes to issue his order. On request of the applicant, the Commissioner will explain the reasons for his action. The notice of opportunity for a hearing will be published in the FEDERAL REGISTER and will specify that the applicant has 30 days after issuance of the notice within which he is required to file a written appearance electing whether:

 (1) To avail himself of the opportunity for a hearing; or

 (2) Not to avail himself of the opportunity for a hearing.

8. 41 Fed.Reg. 51078, App. 1.

9. App. 142–210, 220–222, 234–240, 243–244.

10. 42 Fed.Reg. 46595 (Sept. 16, 1977), App. 245.

## I. THE SUBSTANTIVE LEGAL CONTEXT

The Federal Food, Drug and Cosmetic Act prohibits the introduction into interstate commerce of any new animal drug [11] unless an NADA for the drug has been approved.[12] The substantive criteria governing FDA's decision declining to sanction Proban for OTC use are found in Section 512(d) [13] of the Animal Drug Amendments of 1968, which in pertinent part provides:

> If the Secretary finds, after due notice to the applicant in accordance with subsection (c) of this section and giving him an opportunity for a hearing, in accordance with said subsection, that—
>
> (A) the investigations, reports of which are required to be submitted to the Secretary, pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof;

> (B) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; . . . [or]
>
> (D) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such condition; . . .
>
> he shall issue an order refusing to approve the application.[14]

The Director and the Commissioner both rebuffed Cyanamid's application on the basis of this provision, finding the submitted tests inadequate and ill-designed, and their results inconclusive and in some instances even indicative of the unsafe nature of Proban.[15] The Director and the Commissioner did not indicate reliance on any regulations dealing with these concerns, perhaps because the only ones relevant add little to the statute.[16]

11. The Act defines the term "new animal drug" to mean

> any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed,—
>
> (1) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof; except that such a drug not so recognized shall not be deemed to be a "new animal drug" if at any time prior to June 25, 1938, it was subject to the Food and Drug Act of June 30, 1906, as amended, and if at such time its labelling contained the same representations concerning the conditions of its use; or
>
> (2) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions; or
>
> (3) which drug is composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, or bacitracin or any derivative thereof, except when

> there is in effect a published order of the [Commissioner] declaring such drug not to be a new animal drug on the grounds that (A) the requirement of certification of batches of such drug, as provided for in section 360(b)(n) of this title, is not necessary to insure that the objectives specified in paragraph (3) thereof are achieved and (B) that neither subparagraph (1) nor (2) of this paragraph (w) applies to such drug.
>
> 21 U.S.C. § 321(w) (1976).

12. This is the combined effect of 21 U.S.C. § 360b(a)(1)(A) (1976), 21 U.S.C. § 351(a)(5) (1976) and 21 U.S.C. § 331(a) (1976).

13. 21 U.S.C. § 360b(d) (1976).

14. 21 U.S.C. § 360b(d)(1)(A), (B), (D) (1976).

15. 41 Fed.Reg. 51078–51085, App. 1–8; 42 Fed. Reg. 46595–46610, App. 245–260.

16. 21 C.F.R. § 514.1(8)(iii) (1978) provides:

> An application may be refused unless it contains detailed reports of the investigations, including studies made on laboratory animals, in which the purpose, methods and results obtained are clearly set forth of acute, subacute, and chronic toxicity, and unless it contains appropriate clinical laboratory results related to safety and efficacy. Such

Section 512 deals with applications in general, but the parties are in agreement [17] that it governs here because there are no statutory provisions specifically addressed to supplemental applications [18] or to the showing required to justify marketing a drug OTC.[19] In short, Cyanamid's submission was assayed by the general requirements of Section 512, and was found inadequate to demonstrate the safety of Proban when purchased and administered by dog owners without professional supervision.[20]

## II. FDA SUMMARY JUDGMENT PROCEDURES

Section 512(c) contemplates that an applicant for clearance to market a new animal drug will normally be afforded an opportunity for an adjudicatory hearing on the application.[21] As with hearing requirements in other areas of the drug laws,[22] however, FDA has decided that efficient administration of its mandate warrants dispensing with a hearing if the applicant's submission obviously fails to meet well-established statutory and regulatory criteria for grant of the requested authority.[23] The

---

information should include identification of the person who conducted each investigation, a statement of where the investigations were conducted, and where the raw data are available in the application.

Cyanamid submitted such tests. See notes 57–158 *infra* and accompanying text. See also 21 C.F.R. § 514.111 (1978) (essentially reiterating the demands of § 512(d), quoted in text at note 14 *supra*, with respect to safety tests). Nor do counsel for FDA rest on these regulations, perhaps because of our past admonition:

We shall expect the FDA to make its criticism [of drug applications] express and detailed, and to cite precisely to the pertinent regulations and evidentiary flaws. The regulations are extensive and technical; submitted evidence is typically abstruse and voluminous. Courts cannot efficiently shoulder their heavy burden of review under *Hynson* [*Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973)] unless the Administration's orders make utterly transparent why each piece of submitted evidence fails the particular regulatory provisions relied upon. *Cooper Laboratories, Inc. v. Commissioner*, 163 U.S.App.D.C. 212, 227, 501 F.2d 772, 787 (1974). See also *Cosmopolitan Broadcasting Corp. v. FCC*, 189 U.S.App.D.C. 139, 149–150, 581 F.2d 917, 927–928 (1978).

17. Brief for Petitioner at 12; Brief for Respondents at 5.

18. 21 C.F.R. § 514.8 (1978) does, however, recognize supplemental NADAs and requires certain proposed changes to be supported in specified ways. It does not in terms deal with applications to market OTC previously restricted drugs.

19. The only relevant regulation is 21 C.F.R. § 201.105 (1978), quoted in part in note 3 *supra*.

20. See 41 Fed.Reg. 51078–51085, App. 1–8; 42 Fed.Reg. 46595–46610, App. 245–260.

21. This section provides in full:
Within one hundred and eighty days after the filing of an application pursuant to subsection (b) of this section, or such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall either (1) issue an order approving the application if he then finds that none of the grounds for denying approval specified in subsection (d) of this section applies, or (2) give the applicant notice of an opportunity for a hearing before the Secretary under subsection (d) of this section on the question whether such application is approvable. If the applicant elects to accept the opportunity for a hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.
21 U.S.C. § 360b(c) (1976).

22. *E.g.*, 21 U.S.C. § 355(c)(2) (1976); see *Smithkline Corp. v. FDA*, 190 U.S.App.D.C. 210, 587 F.2d 1107 (1978).

23. FDA has spelled out the general standard governing use of the summary judgment procedure. 21 C.F.R. § 514.200(c) (1978) provides:
If the applicant elects to avail himself of the opportunity for a hearing, he is required to file a written appearance requesting the hearing within 30 days after the publication of the notice, giving the reason why the application should not be refused or should not be withdrawn, together with a well-organized and full-factual analysis of the clinical and other investigational data he is prepared to prove in support of his opposition to the Commissioner's proposal. A request for a hearing may not rest upon mere allegations or denials, but must set forth specific facts showing there is a genuine and substantial issue of

courts have sustained this course for a simple reason: they "cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's 'pleadings' that the application cannot succeed." [24]

There are two broad approaches that FDA has employed to truncate consideration of an application which by statute is otherwise to be ventilated in a trial-type hearing.[25] Under one approach, FDA has exercised its rulemaking authority to refine the statutory standards.[26] Then, "where it is apparent at the threshold that the applicant has not tendered *any* evidence which *on its face* meets the statutory standards as particularized by the regulations," [27] FDA may justifiably reject the application without conducting a hearing that could be no more than a hollow ritual. The Supreme Court's decision in *Weinberger v. Hynson, Westcott & Dunning,*[28] upheld this summary judgment procedure, cautioning, however, that where the regulations are so imprecise that it is not possible to say confidently from the face of the submission that the standards have not been met, denial of a hearing is improper.[29]

We have declined to undertake categorical classification of regulations as "precise" or "imprecise", however, and have suggested that "the precision of a regulation will vary with the context in which it is invoked." [30] But when a statute or regulation utilizes but does not particularize broad judgmental concepts, and requires "adequate and well-controlled investigations" [31] or "adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions" proposed,[32] it is difficult to demonstrate that a submission is conclusively deficient. A study should not, and according to FDA will not, be deemed conclusively inadequate unless it totally fails "even to attempt to

fact that requires a hearing. When it clearly appears from the data in the application and from the reasons and a factual analysis in the request for the hearing that no genuine and substantial issue of fact precludes the refusal to approve the application or the withdrawal of approval of the application (for example, no adequate and well-controlled clinical investigations to support the claims of effectiveness have been identified), the Commissioner will enter an order on this data, stating his findings and conclusions. If a hearing is requested and is justified by the applicant's response to the notice of opportunity for a hearing, the issues will be defined, an Administrative Law Judge will be named, and he shall issue a written notice of the time and place at which the hearing will commence. In the case of denial of approval, such time shall not be more than 90 days after the expiration of such 30 days unless the Administrative Law Judge and the applicant otherwise agree; and, in the case of withdrawal of approval, such time shall be as soon as practicable.

24. *Weinberger v. Hynson, Westcott & Dunning, Inc., supra* note 16, 412 U.S. at 621, 93 S.Ct. at 2479, 37 L.Ed.2d at 218 (footnote omitted). See also *FPC v. Texaco,* 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112, 117 (1964); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771–772, 100 L.Ed. 1081, 1092 (1956).

25. See generally, Ames & McCracken, *Framing Regulatory Standards to Avoid Formal Adjudi-* *cation: The FDA As a Case Study,* 64 Calif.L. Rev. 14 (1976).

26. See, e.g., *Weinberger v. Hynson, Westcott & Dunning, Inc., supra* note 16; *Holland-Rantos Co. v. HEW,* 190 U.S.App.D.C. 276, 587 F.2d 1173 (1978); *Smithkline Corp. v. FDA, supra* note 22; *Masti-Kure Prods. Co., Inc. v. Califano,* 190 U.S.App.D.C. 202, 587 F.2d 1099 (1978); *Edison Pharmaceutical Co. v. FDA,* 168 U.S.App.D.C. 273, 513 F.2d 1063 (1975), *later petition for review,* 600 F.2d 831 (1979); *Cooper Laboratories, Inc. v. Commissioner, supra* note 16; *USV Pharmaceutical Corp. v. Secretary,* 151 U.S.App.D.C. 284, 466 F.2d 455 (1972); *Pfizer, Inc. v. Richardson,* 434 F.2d 536 (2d Cir. 1970).

27. *Weinberger v. Hynson, Westcott & Dunning, Inc., supra* note 16, 412 U.S. at 620, 93 S.Ct. at 2478, 37 L.Ed.2d at 218 (emphasis in original).

28. *Supra* note 16.

29. 412 U.S. at 621 n. 17, 93 S.Ct. at 2479 n. 17, 37 L.Ed.2d at 218 n. 17.

30. *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 220, 501 F.2d at 780.

31. 21 U.S.C. § 355(d) (1976).

32. 21 U.S.C. § 360b(d)(1)(A) (1976).

comply"[33] with standards whose application call for subjective and discretionary judgments.

*Hynson*[34] and our own decisions[35] have indicated that when FDA's objection to a submission has no foundation in any specific regulation, it "cannot trigger a summary disposition,"[36] but these statements must be taken in context. When FDA denies or withdraws approval of a drug, it often provides only summary notice of its proposed denial or withdrawal to the affected manufacturer, who is afforded a short period of time within which to respond.[37] FDA then issues a final denial or on occasion may grant a hearing. Particularized regulations are necessary to provide the drug manufacturer with notice as to just what its submission must contain to warrant initial or continued authorization to market a drug.[38]

Most of FDA's summary action has concerned drug efficacy, not drug safety.[39] Indeed, the impetus to FDA's formulation of summary judgment procedures was the 1962 Drug Amendments to the Federal Food, Drug and Cosmetic Act,[40] which, by defining "new drug" to mean any drug not generally recognized as effective as well as

safe, for its intended use,[41] imposed for the first time FDA pre-marketing review of the effectiveness of drugs. The Amendments provided that a drug would not be approved unless the application presented "substantial evidence"[42] based on "adequate and well-controlled investigations"[43] of the drug's efficacy. In order to carry out this directive efficiently, FDA fashioned regulations that refined and particularized what would reasonably be deemed "adequate and well-controlled investigations."[44]

The Federal Food, Drug and Cosmetic Act contains no strictly comparable provision delineating the nature of the evidentiary showing required to prove the safety of a new drug.[45] Perhaps for this reason, or because there is less ground for generalizing as to the types of tests and results necessary to demonstrate a drug's safety, or because it faces a more manageable workload in this area, FDA has not seen fit to promulgate detailed regulations defining the kinds of safety tests it would consider adequate or the sort of margin of safety that it would deem sufficient.

Nevertheless, FDA in this case, as in a few past instances,[46] has denied an appli-

**33.** 39 Fed.Reg. 9757 (Mar. 13, 1974).

**34.** 412 U.S. at 620, 93 S.Ct. at 2478, 37 L.Ed.2d at 217–218.

**35.** *Smithkline Corp. v. FDA, supra* note 22, 190 U.S.App.D.C. at 222, 587 F.2d at 1119; *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 223, 501 F.2d at 783.

**36.** *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 229, 501 F.2d at 789 (dissenting opinion).

**37.** See *id.* at 232, 501 F.2d at 792 (dissenting opinion).

**38.** See *Hess & Clark, Inc. v. FDA*, 161 U.S.App.D.C. 395, 405, 495 F.2d 975, 985 (1974); *Sterling Drug, Inc. v. Weinberger*, 503 F.2d 675, 681–683 (2d Cir. 1974).

**39.** See cases cited *supra* note 26.

**40.** Act of Oct. 10, 1962, Pub.L. No. 87–781, 76 Stat. 781.

**41.** See 21 U.S.C. § 321(p) (1976).

**42.** See 21 U.S.C. § 355(d) (1976).

**43.** See *id.*

**44.** See generally, *Weinberger v. Hynson, Westcott & Dunning, Inc., supra* note 16, 412 U.S. at 616–620, 93 S.Ct. at 2476–2478, 37 L.Ed.2d at 215–218.

**45.** 21 U.S.C. § 360b(d)(A) (1976), quoted in text *supra* at note 14, requires submission of adequate tests employing all reasonably applicable methods, and much of 21 U.S.C. § 355(d) (1976) relates to safety, but not in the detail with which substantial evidence of efficacy is defined. See *Edison Pharmaceutical Co. v. FDA, supra* note 26, at 840 ("studies showing the safety of a drug need not be adequate and well-controlled within the meaning of 21 C.F.R. § 314.111(a)(5), compare 21 U.S.C. § 355(d)(1) with 21 U.S.C. § 355(d)(5) . . .").

**46.** See *Hess & Clark, Inc. v. FDA, supra* note 38; *Chemetron Corp. v. HEW*, 161 U.S.App.D.C. 415, 495 F.2d 995 (1974); *E. R. Squibb & Sons, Inc. v. Weinberger*, 483 F.2d 1382 (3d Cir. 1973); *Dyestuffs & Chems, Inc. v. Flemming*, 271 F.2d 281 (8th Cir. 1959), *cert. denied*, 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960).

cant a hearing on the ground that the submissions were conclusively insufficient to prove the drug's safety. In *Hess & Clark, Inc. v. FDA*,[47] we approved in principle FDA's use of summary judgment based on a case-by-case particularization of the statutory safety standards. When, however, FDA proceeds by way of *ad hoc* articulation of safety standards, it is clearly incumbent upon it to give the applicant notice of those standards and of the manner in which the data before it failed to meet them. This notice must be given in timely fashion to put the applicant in position to dispute FDA's interpretation of the Act's safety criteria, object to FDA's critique of the submitted studies, and conduct and proffer new studies meeting the newly-articulated requirements.[48] Should the applicant then identify a material issue of fact, FDA must hold a hearing.

■ In this case, FDA leveled essentially two sorts of objections at Cyanamid's presentation. First, it criticized the methodology of the research relied on by Cyanamid,[49] particularizing the general statutory injunction that adequate tests be submitted.[50] This is valid ground for denying a hearing only if Cyanamid had a fair opportunity to dispute the newly-articulated standards and to resubmit compliant tests, or if the original tests conclusively failed to meet the general statutory prerequisites.[51] Second, it felt that the test results did not support Cyanamid's claim of Proban's safety,[52] a conclusion to be sustained, of course, if FDA's interpretation and application of the statutory safety standards are unimpeachable. If, for example, the data tendered had indicated that 50 percent of the dogs administered Proban at the recommended dosage and regimen died from the drug, FDA's judgment that Proban had not been shown to be safe would be unassailable. Though the statutory requirements are broad, there indubitably are some instances, such as that hypothesized, where submissions would conclusively run afoul of those provisions.

■ In light of these principles, we turn to consider FDA's evaluation of Cyanamid's submission. If FDA identified at least one conclusive deficiency in each of the tests proffered, its action must be upheld.[53] If, however, studies adopting all "reasonably applicable" methods of showing Proban's safety for OTC use have not been conclusively demonstrated to be inadequate, FDA must hold a hearing.[54]

## III. CYANAMID'S SUBMISSIONS AND FDA'S EVALUATION

Cyanamid tendered laboratory studies, clinical field tests and drug experience reports to FDA in support of its request for an NADA sanctioning OTC sale of Proban.[55] As already explained, FDA's sum-

47. 161 U.S.App.D.C. at 405–414, 495 F.2d at 985–994; see *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 232–233, 501 F.2d at 792–793 (dissenting opinion).

48. See generally *Hess & Clark, Inc. v. FDA, supra* note 38, 161 U.S.App.D.C. at 403–405, 495 F.2d at 983–985.

49. See Part III(B) *infra*.

50. See notes 127–138 *infra* and accompanying text.

51. In theory, of course, FDA could particularize what results it would consider supportive of safety, just as it does with methodological accuracy. This may not be realistic, however. See note 66 *infra* and accompanying text.

52. See Part III(A) *infra*.

53. "Should we find each study to be conclusively deficient with respect to even a single regulatory standard, we must sustain" FDA's order granting summary judgment. *Masti-Kure Prods. Co. v. Califano, supra* note 26, 190 U.S.App.D.C. at 207, 587 F.2d at 1104; see *Smithkline Corp. v. FDA, supra* note 22, 190 U.S.App.D.C. at 223–224, 587 F.2d at 1120–1121; *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 217–226, 501 F.2d at 777–786.

54. See 21 U.S.C. § 360b(d)(A) (1976), quoted in text *supra* at note 14; cases cited *supra* note 53.

55. See App. 142–197, 201–204, 208–210, 220–222, 234–240, 243–244.

Section 512(d) requires a new animal drug's sponsor to submit adequate laboratory studies demonstrating the drug's safety under the pro-

mary action can be sustained here only if these submissions were conclusively deficient in light of the general statutory and regulatory criteria, or if FDA's *ad hoc* particularization of those standards was not genuinely and reasonably disputed and Cyanamid has been afforded time to present compliant tests.[56] FDA's critical exceptions to Cyanamid's studies can be placed in two groups: methodological objections, and conclusions on whether the test results supported, negated or did little to affect Cyanamid's claim of Proban's safety. These we consider in reverse order.

## A. *Safety Determinations*

### 1. *Acute Toxicity Studies*

Cyanamid submitted two acute toxicity studies of the active ingredient in Proban, cythioate, an organophosphate.[57] In its Grosse & Rohrbacher Study No. 1, eight dogs were administered technical grade cythioate daily at seven different dose levels ranging from ten milligrams (mg.) to 350 mg. of cythioate per kilogram (kg.) of body weight.[58] The dosage level proposed is 3.3 mg. per kg. of body weight given twice a week.[59] Only one of the tested dogs died, and surprisingly it was one of four issued 25 mg. for three to five days.[60] No signs of toxicity were observed in the one

dog administered 10 mg. for three consecutive days.[61] Salivation and emesis occurred in most dogs given 50 mg. doses or higher.[62]

The Director of the Bureau of Veterinary Medicine, joined by the Commissioner of Food and Drugs after Cyanamid responded to the NOH, concluded that this study "clearly fails to demonstrate that the drug is safe for [OTC] use."[63] indeed, they thought that "the study demonstrate[d] that Proban is toxic and may be unsafe for use without the supervision of a veterinarian."[64] Cyanamid's experts vigorously disputed FDA's evaluation of Grosse & Rohrbacher Study No. 1. They pointed out that the study was designed to pinpoint the safe and unsafe levels of cythioate dosages;[65] that Proban, like nearly all drugs,[66] is unsafe if extreme amounts are ingested; and that the study does suggest that short-term usage of Proban at three times the recommended dosage and thrice as often as proposed causes no long-lasting adverse effects on dogs.[67]

Many of FDA's reservations about this study may be valid, but our function is not to choose among expert opinions but to determine whether FDA's evaluation of the study conclusively establishes that the investigation has not proven the safety of

---

posed conditions of use. See note 14 *supra* and accompanying text. FDA denied the supplement for Proban on the ground that such tests had not been presented. See generally notes 57–160 *infra* and accompanying text. Our review of the record persuades us that FDA acted prematurely, see notes 57–160 *infra* and accompanying text, and thus we do not enter the parties' debate over whether experience with cythioate, on a restricted basis in this country and on an OTC basis in Australia, and with flea collars containing organophosphates available OTC here, clearly indicates Proban's safety when marketed OTC. See, *e.g.*, 41 Fed.Reg. 51082–51084, App. 5–7. See generally *Edison Pharmaceutical Co., Inc. v. FDA, supra* note 26, at 840–841 (safety tests "must be adequately constructed so that scientists can draw reasonable conclusions from them").

**56.** See notes 47–54 *supra* and accompanying text.

**57.** Proban contains 1.6% cythioate. 42 Fed. Reg. 46595, App. 245.

**58.** 41 Fed.Reg. 51080, App. 3.

**59.** 42 Fed.Reg. 46597, App. 247.

**60.** *Id.*

**61.** 41 Fed.Reg. 51080, App. 3.

**62.** *Id.*

**63.** *Id.*; 42 Fed.Reg. 46598, App. 248.

**64.** 41 Fed.Reg. 51080, App. 3.

**65.** See Affidavit of Clara H. Williams, Retired Chief of Toxicology Branch, EPA, at 3, App. 144.

**66.** See *Hess & Clark, Inc. v. FDA, supra* note 38, 161 U.S.App.D.C. at 413–414, 495 F.2d at 993–994, citing Merril, *Compensation for Prescription Drug Injuries*, 59 Va.L.Rev. 1 (1973).

**67.** Affidavit of Clara H. Williams, *supra* note 65, at 3, App. 144.

Proban when used under the conditions proposed. Since no particular margin of safety is prescribed by statute or regulation for OTC marketing of animal drugs, we cannot say that the episode of the dog administered a triple dose for three consecutive days does not support Cyanamid's claim.

In Cyanamid's McNerny Study, another acute toxicity investigation, seven groups of three dogs each were utilized to examine the effects of Proban when used in conjunction with other organophosphates and other cholinesterase inhibitors to which dogs are commonly exposed.[68] Each dog received a 150 percent dosage of Proban plus a 150 percent dosage of the other drugs.[69] The Director felt that this study laid bare "Proban's acute toxicity and potential for harm." [70] and further that the drug's "toxicity is potentiated by other neurologically active drugs, including organophosphates." [71] The Commissioner, however, agreed with Cyanamid's experts [72] that the study did not show,[73] as the Director had suggested,[74] that Proban has a potentiating effect—that its effect in combination with another drug is greater than the sum of the separate effects of the two drugs.[75] But the Commissioner did concur with the Director's ultimate conclusion that the McNerny Study failed to demonstrate the safety of Proban and, on the contrary, indicated its dangerousness.[76]

Cyanamid's experts interpreted the data strikingly differently from FDA. For example, Dr. Clara H. Williams, an independent toxicologist retired from responsible positions with FDA and EPA, noted that the dogs administered Proban and Kem-Dip, which contains two organophosphates, exhibited no reaction at all.[77] In her opinion, none of the dogs had severe reactions, although some experienced diarrhea and vomiting.[78] And all dogs returned to normal within 48 hours.[79].

There is, then, a genuine issue of fact as to the meaning of the McNerny Study, and we can avow no present certitude as to the upshot of the controversy. Thus the study has not been conclusively shown to fail to support Proban's safety under the conditions of proposed use.

### 2. Other Short-Term Studies

In Cyanamid's Grosse & Rohrbacher Study No. 2, one male dog was administered 10 mg. of cythioate per kg. of body weight for 61 consecutive days.[80] This dog exhibited some muscular weakness between the 13th and 22nd days, but he recovered and no further toxic effects were observed.[81] Two female dogs were given a 1 mg. per kg. dose for 30 straight days and two other female dogs were administered 2.5 mg. per kg. for 30 consecutive days.[82] None of the female dogs showed any visible signs of toxicity, but all of the dogs experienced reduction in their erythrocyte cholinesterase and plasma cholinesterase values.[83] As before, the Director and the Commissioner felt that far from demonstrating

68. Affidavit of C. Boyd Shaffer, Director of Toxicology, American Cyanamid Co., at 2, App. 187.

69. 42 Fed.Reg. 46598, App. 248.

70. 41 Fed.Reg. 51080, App. 3.

71. *Id.*

72. *E.g.*, Affidavit of Clara H. Williams, *supra* note 65, at 2, App. 143.

73. 42 Fed.Reg. 46598, App. 248.

74. 41 Fed.Reg. 51080, App. 3.

75. Affidavit of Clara H. Williams, *supra* note 65, at 2, App. 143.

76. 42 Fed.Reg. 46598, App. 248.

77. Affidavit of Clara H. Williams, *supra* note 65, at 2, App. 143.

78. *Id.*

79. *Id.*

80. 41 Fed.Reg. 51080, App.3.

81. See *Request for Hearing*, at 33–34, App. 46–47.

82. 41 Fed.Reg. 51080, App. 3.

83. *Id.*

Proban's safety, this study supported the opposite conclusion.[84]

Cyanamid's experts, on the other hand, considered this study suggestive of Proban's safety, pointing to the absence of any clinical evidence of toxicity among the groups receiving the lower dosages.[85] Furthermore, Dr. W. D. Black, a toxicologist, stated in an affidavit that "[d]ecreased levels of cholinesterase are not in themselves evidence of toxicity, merely evidence that the animal has been exposed to organophosphates[;] [i]t is well recognized that cholinesterase depression has to be extensive before symptoms of toxicity appear."[86] The "pleadings" thus do not conclusively support FDA's opinion that Grosse & Rohrbacher Study No. 2 failed to support Proban's safety when marketed OTC.

Cyanamid also filed with FDA a Wang & Colavita Study, a short-term investigation of Proban's toxicity primarily measuring the drug's effect on the food consumption and body weight of treated dogs, as well as monitoring clinical signs of toxicity.[87] Sixteen dogs were involved in this study; eight were administered Proban and eight served as controls.[88] Two times per week for ten weeks, each treated dog was given four times the recommended dose of Proban.[89] The Director analyzed the data from the Wang & Colavita Study and declared that although there were no significant differences in body weight between treated and controlled dogs after ten weeks, the study did establish "cythioate's capacity to decrease a dog's food consumption, a significant adverse reaction that is characteristic

of organophosphate toxicity."[90] He emphasized, moreover, that one of the eight dogs tested "exhibited a patent sign of organophosphate toxicity, vomiting."[91] The Commissioner adopted the Director's view, attributing the stability in weight of the treated and control-group dogs to the fact that both groups were given smaller rations after three weeks, thus preventing "the control dogs from eating more than the dogs on drugs."[92]

Cyanamid vigorously disputed FDA's evaluation of the Wang & Colavita Study and indeed considers it a most convincing demonstration that Proban is safe for OTC use.[93] In the first place, Cyanamid and its experts maintained that the fact that a small amount of vomitus was observed in one dog's cage six hours after medication during the ninth week of the study should not be considered significant—that in any kennel situation, one of a group of dogs would reasonably be expected to vomit at least once without receiving any drugs.[94] More importantly, Dr. Williams took sharp exception with the Director's statement, later adopted by the Commissioner, that the treated dogs were less apt to consume the ration offered and that the study showed the capacity of cythioate to decrease a dog's food consumption;[95] in her affidavit, Dr. Williams suggested that the data show just the reverse of FDA's assertions.[96] She expressed the opinion that the "toxicity study by Wang and Colavita demonstrates that cythioate when administered to both adult and young dogs at 4 times the recom-

---

84. *Id.*, App. 4; 42 Fed.Reg. 46599, App. 249.

85. Affidavit of Clara H. Williams, *supra* note 65, at 3, App. 144.

86. Affidavit of W. D. Black, Associate Professor of Biomedical Sciences, University of Guelph, at 1, App. 154.

87. Affidavit of Clara H. Williams, *supra* note 65, at 3–4, App. 144–145.

88. 41 Fed.Reg. 51081, App. 4.

89. Affidavit of Clara H. Williams, *supra* note 65, at 3, App. 144.

90. 41 Fed.Reg. 51081, App. 4.

91. *Id.*

92. 42 Fed.Reg. 46599, App. 249.

93. See *Request for Hearing, supra* note 81, at 37–41, App. 50–54.

94. Affidavit of Michael A. Gallo, Vice President, Food and Drug Research Laboratories, Inc., at 1, App. 183.

95. Affidavit of Clara H. Williams, *supra* note 65, at 4, App. 145.

96. *Id.*

mended dose for 10 weeks had no observable adverse effects upon physical condition, weight gain or food consumption. This would indicate the safe use of Proban as an OTC compound." [97]

Again we confront striking differences in interpretation of a toxicity study. Since our task is not to resolve material issues in dispute but only to see whether, on the basis of the materials on file, such issues exist, we are satisfied that FDA did not conclusively establish that the results of the Wang & Colavita study do not support Cyanamid's request for a supplemental NADA.

### 3. Long-Term Studies

To further bolster its application, Cyanamid submitted findings of a group investigation known as the Esposito Study. Twenty beagles were divided into four treatment groups and one negative control group.[98] Daily for six months, each dog in a treatment group received cythioate mixed with its food.[99] The dogs were given the drugs in varying amounts: Group A, 0.5 mg./kg., approximately 48 percent of the cumulative cythioate ingested by a dog given the recommended doses of Proban at the recommended intervals for a period of six months;[100] Group B, 1.0 mg./kg., about 96 percent;[101] Group C, 1.5 mg./kg., about 126 percent;[102] and Group D, 10.7 mg./kg., about 880 percent for two weeks then 6.5 mg./kg., about 585 percent, the remaining 22 weeks.[103] Administration of the three relatively low doses was designed to test the effect of prolonged use of cythioate on blood and brain cholinesterase activity;[104] the high dose in Group D was to ascertain the effect of massive overdosage.[105]

As with Cyanamid's other scientific investigations, the Director and the Commissioner deemed the results of the Esposito Study disturbing, while Cyanamid and its experts found them heartening. According to the Director, the group of dogs receiving the highest doses experienced tremors and severely depressed cholinesterase activity.[106] Reduction in plasma cholinesterase activity was detected in the group receiving 126 percent of the proposed OTC dose.[107] "More importantly," said the Director, "renal collecting tubule lipidosis occurred in one of the four animals treated, focal engorgement of the spleen occurred in two of the four animals treated, and elevation of the plasma alkaline phosphatase occurred in one of two animals treated and studied." [108] The Commissioner supported the Director's conclusion, adding that the dogs receiving the lower doses experienced significant drops in their cholinesterase levels.[109]

Dr. C. Boyd Shaffer, on the other hand, interpreted the Esposito Study, which was conducted under his administrative direction as director of toxicology for Cyanamid, as establishing that the dogs in the three groups receiving the lower doses "remained in good health." [110] Specifically, Dr. Shaffer challenged the significance attributed to the "renal microscopic pathology" [111] and to the "occurrence of fat globules in the cells of the collecting tubules." [112] He agreed that all animals fed

97. Id.

98. 42 Fed.Reg. 46601, App. 251.

99. 41 Fed.Reg. 51081, App. 4.

100. Id.

101. Id.

102. Id.

103. Id.

104. Affidavit of C. Boyd Shaffer, supra note 68, at 1, App. 201.

105. Id.

106. 41 Fed.Reg. 51081, App. 4.

107. Id.

108. Id.

109. 42 Fed.Reg. 46601–46602, App. 251–252.

110. Affidavit of C. Boyd Shaffer, supra note 68, at 2, App. 202.

111. Id.

112. Id. at 3, App. 203.

cythioate experienced a reduction in cholinesterase activity, but suggested that this stabilized at safe levels in the dogs fed 48, 96 and 126 percent of the recommended OTC dose.[113] Dr. Shaffer was of the opinion that the Esposito Study "demonstrates that the long-term use of cythioate would be safe for the target species." [114]

Dr. Williams shared Dr. Shaffer's judgment that the Esposito Study indicates Proban's safety for long-term use.[115] She noted that no serious toxic effects were observed in any dogs and predicted that the reduced cholinesterase activity would be reversible and would not endanger the health of treated dogs, especially since "the recommended duration of treatment of flea infested dogs with Proban is only several weeks." [116]

Once more a dispute over the scientific significance of a toxicology study is presented. We are not called upon to resolve the central scientific question, and fortunately so, for we have neither training nor special aptitude in toxicology. Rather, we are to decide only the legal question whether the studies and their results have been shown to be conclusively deficient.[117] In light of the conflict in responsible expert opinion, we hold that FDA's summary ac-

tion cannot be sustained on the ground that Cyanamid's submissions conclusively fail to demonstrate Proban's safety for OTC use.[118]

### B. Methodological Objections

The Director and the Commissioner also assailed the methodology of the studies presented by Cyanamid.[119] In their view, even if the results of these tests forcefully underpinned the claim of Proban's safety, Cyanamid's application should still be denied without a hearing for failure to introduce, as required by Section 512(d)(A), "adequate tests by all methods reasonably applicable to show whether or not [the] drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof . . . ." [120]

Our review of the propriety of FDA's summary denial of Cyanamid's NADA request on the ground that the studies were methodologically inadequate is governed by the same strict standard applicable in assaying FDA's evaluation of their results: FDA's action should be sustained if and only if the materials on file establish that the studies are "conclusively inadequate." [121] So formulated, however, the standard is incomplete because it neglects to indicate its frame of reference. In *Hyn-*

113. *Id.*

114. *Id.*

115. Affidavit of Clara H. Williams, *supra* note 65, at 6, App. 147.

116. *Id.* at 6, App. 147. Unlike the presently used Proban package insert, App. 114, the proposed OTC labeling, App. 118, does not caution against prolonged use of Proban, but does inform that "several weeks are necessary to remove the fleas that reinfest dogs from their environment." App. 119.

117. To decide the scientific merits of these disputes, on the basis of the record now before us, would certainly be to risk the dangerous unreliability likely to occur when "technically illiterate judges" attempt substantively to review mathematical and scientific questions.

That risk, may, in the end, prove inescapable, but it can perhaps be minimized if it is kept firmly in mind that we need not resolve the *scientific* question of the methodological

adequacy of [the submitted tests], but the *legal* question of whether they are on their face conclusively inadequate . . . . . The manner in which we resolve this latter question involves policy considerations: we must take account of both fairness to the petitioner and the public interest in effective drug regulation.

*Smithkline Corp. v. FDA, supra* note 22, 190 U.S.App.D.C. at 222, 587 F.2d at 1119, quoting *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 439, 541 F.2d 1, 67, 541 F.2d 1, 67 (concurring opinion), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (emphasis in original).

118. See *Smithkline Corp. v. FDA, supra* 22, 190 U.S.App.D.C. at 221, 587 F.2d at 1118.

119. 41 Fed.Reg. 51080–51082, App. 3–5; 42 Fed.Reg. 46597–46602, App. 247–252.

120. 21 U.S.C. § 360b(d)(A) (1976).

121. *Smithkline Corp. v. FDA, supra* note 22, 190 U.S.App.D.C. at 221, 587 F.2d at 1118.

son[122] and most of the cases in which FDA's summary dispositions have been upheld, the "pleadings" were conclusively deficient in light of precise, pertinent regulations.[123] As we have exhaustively detailed, FDA here thought that the results of the studies relied on by Cyanamid did not demonstrate Proban's safety for OTC use.[124] This is analogous to *Hynson* except that the statutory standard is not precise and hence a conclusive showing of inadequacy is less likely to be made.[125]

FDA's methodological objections to the studies proffered by Cyanamid add a new twist. On the one hand, FDA's evaluation could conceivably demonstrate beyond peradventure that the tests are not adequate within the meaning of Section 512(d)(A).[126] This is of a kind with FDA's interpretation of the test results, an attempt to establish that the studies manifestly failed to satisfy the general statutory requirements. On the other hand, the methodological objections could be sustained on another, different ground. FDA may, on a case-by-case basis,

define and narrow the statutory requirement of adequate tests by announcing and applying particular principles of scientific methodology.[127] But, as has aptly been observed, "[t]his is fair enough. What may not be fair is a system of particularization without hearings, letting applicants know after the fact that they were in default all along for failure to observe a requirement that had not yet been spelled out."[128] Only, then, if this procedure affords the applicant the opportunity to proffer compliant studies and to dispute the FDA's approach is it consistent with elemental fairness and the statutory right to a hearing.[129] Should the applicant attempt to submit compliant studies or to "point out flaws in the FDA's approach,"[130] a hearing must be held unless the effort is "palpably shallow."[131] In adjudging whether FDA's action is a permissible fleshing out of the statute, however, attention must be focused on the NOH issued by the Director, not on the final denial of the hearing by the Commissioner. It was the Director's position,

---

**122.** *Weinberger v. Hynson, Wescott & Dunning, Inc.,* supra note 16.

**123.** *E.g., Masti-Kure Prods. Co., Inc. v. Califano,* supra note 26; *Cooper Laboratories, Inc. v. Commissioner,* supra note 16.

**124.** See notes 57–116 *supra* and accompanying text.

Even a relatively precise regulation may create a small zone of ambiguity, and a particular piece of evidence submitted by an applicant may fall into that zone. By the same token, a regulatory provision which seems vague in the abstract may nonetheless be conclusively at odds with a peculiarly deficient item of evidence. *Cooper Laboratories, Inc. v. Commissioner,* supra note 16, 163 U.S.App.D.C. at 220, 501 F.2d at 780.

**125.** See notes 30–33 *supra* and accompanying text.

**126.** 21 U.S.C. § 360b(d)(A) (1976).

**127.** See note 51 *supra* and accompanying text. The Supreme Court has instructed that "the choice . . . between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947). See *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–295, 94 S.Ct.

1757, 1770–1772, 40 L.Ed.2d 134, 152–154 (1974); *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 764–766, 89 S.Ct. 1426, 1429–1430, 22 L.Ed.2d 709, 714–715 (1969).

**128.** *Cooper Laboratories, Inc. v. Commissioner,* supra note 16, 163 U.S.App.D.C. at 232, 501 F.2d at 792 (dissenting opinion).

**129.** *Id.* Cf. *NLRB v. Bell Aerospace Co.,* supra note 127, where the Court stated:

[I]t is true, of course, that rulemaking would provide the Board with a forum for soliciting the informed views of those affected in industry and labor before embarking on a new course. But surely the Board has discretion to decide that the adjudicative procedures in this case may also produce the relevant information necessary to mature and fair consideration of the issues. *Those most immediately affected,* the buyers and the company in the particular case, *are accorded a full opportunity to be heard before the Board makes its determination.*
416 U.S. at 295, 94 S.Ct. at 1772, 40 L.Ed.2d at 154 (emphasis supplied).

**130.** *Cooper Laboratories, Inc. v. Commissioner,* supra note 16, 163 U.S.App.D.C. at 232, 501 F.2d at 792 (dissenting opinion).

**131.** *Id.* at 233, 501 F.2d at 793.

not the Commissioner's, that Cyanamid has had the opportunity to controvert or acquiesce in.[132]

The Director leveled several methodological objections at the studies relied on by Cyanamid. He criticized both the first and second Grosse & Rohrbacher Studies for failing to include control groups.[133] He assailed these same two studies, as well as the Esposito Study, for using an unformulated, technical grade of cythioate instead of the proposed marketed formulation of Proban.[134] The Director also took exception to the failure of Grosse & Rohrbacher Study No. 1 and the Wang & Colavita Study to perform "clinical pathology, including cholinesterase level determinations. . . ."[135] Further, he considered the size of the test populations much too small in both Grosse & Rohrbacher studies and in the Esposito investigation.[136] Lastly, the Director indicated that Cyanamid had failed to submit any tests of sufficient duration "to establish the safety of [Proban] for long-term OTC use in dogs,"[137] and assailed the Esposito Study, in which dogs were fed cythioate daily for six months, for neglecting to show that "results from studies in which Proban or cythioate is administered daily in small doses are comparable to results from studies in which the animals receive the same cumulative dose at higher levels every three days, which is the recommended treatment schedule."[138]

Cyanamid fought the Director's critique of the submitted studies' methods. Cyanamid first challenged the Director's view that those studies lacking a control element were ipso facto inadequate. According to Cyanamid, studies conducted without a control group are simply less favorable to the drug's sponsor, since all abnormal reactions in the tested species must be attributed to the drug.[139] The Commissioner, in his final order, employed just this approach,[140] and it does possess a certain logic; thus, this response cannot be considered "palpably shallow."[141]

Cyanamid also attacked the Director's conclusion that the validity of several of the tests was vitiated by their use of technical grade cythioate instead of the proposed commercial formulation of Proban complete with inactive diluents.[142] According to Dr. Williams, "[p]rotocols for toxicity tests for FDA and EPA routinely require the technical material, because formulations may change for different product uses."[143] And Dr. Shaffer added that "the innocuous diluents that are used in the preparation of cythioate in its commercial form would have no influence on the results."[144] Surely these responses were not frivolous, but the Commissioner nevertheless felt that testing with the final formulation was essential to demonstrate Proban's safety, noting that in field tests Cyanamid had had to change the inactive ingredients in Proban to prevent tested dogs from refusing their feed.[145] But the Commissioner's point cannot be considered conclusive for, as Cyanamid has stressed, the fact that an inactive ingredient may affect a drug's palatability

132. See notes 34–38 *supra* and accompanying text.

133. 41 Fed.Reg. 51080, App. 3.

134. *Id.* 51080–51081, App. 3–4.

135. *Id.* 51080, App. 3.

136. *Id.* 51080–51082, App. 3–5.

137. *Id.* 51081, App. 4.

138. *Id.*

139. See *Request for Hearing, supra* note 81, at 77, App. 90.

140. *E.g.,* 42 Fed.Reg. 46598, App. 248 ("[b]ecause no controls were used, as Cyanamide suggests, any reaction must be considered a toxic reaction").

141. See note 131 *supra* and accompanying text.

142. See note 134 *supra* and accompanying text.

143. Affidavit of Clara H. Williams, *supra* note 65, at 4–5, App. 145–146.

144. Affidavit of C. Boyd Shaffer, *supra* note 68, at 1, App. 201.

145. 42 Fed.Reg. 46601, App. 251.

does not indicate that it also influences its toxicity or safety.[146]

In response to the Director's objection to the failure of some of the studies to measure signs of clinical pathology, including cholinesterase reductions, Cyanamid argued that many scientific authorities indicate that such measurements are not strictly necessary, since harmful reductions will surface in overt, detectable symptoms of toxicity.[147] Moreover, the Esposito Study did undertake these measures, and it should be borne in mind that although the statute requires that a drug's sponsor demonstrate the drug's safety by submitting adequate tests employing all methods reasonably applicable,[148] it cannot be gainsaid that some of the relevant methods and techniques may be used in certain tests while the remainder of the showing is made through separate studies.

The Director's concern over the small size of the population tested in some of the studies seems warranted.[149] This does not totally deprive those investigations of probative value, however, but rather simply lessens their force as a matter of statistical significance.[150] And in view of the not inconsiderable body of expert opinion maintaining that the results of those studies are probative of Proban's safety for OTC use,[151] this material issue remains in dispute.

Cyanamid has also attempted to lay to rest the Director's concern over extrapolation from the results of the Esposito Study, which involved daily administration of relatively small doses of cythioate, to conclusions about the safety of Proban when administered in less frequent but larger doses, with the cumulative amount received remaining constant.[152] The Director was concerned, for example, that a daily 1 mg./kg. dose might be less toxic than a 2 mg./kg. dose administered every other day;[153] if so, the margin of safety suggested by the Esposito Study might be illusory, for Cyanamid's proposal is that Proban be administered only twice a week. But Dr. Williams asserted that "daily dietary administration" is "more rigorous"[154] than the recommended dose, while Dr. Shaffer more cautiously suggested that data from the Esposito Study were instructive on Proban's safety at the recommended regimen because "[e]xperienced toxicologists are capable of making judgments of safety from the results of daily administration that would be applicable to intermittent administration of closely similar dosages."[155] Thus we cannot presently say that the Director has conclusively identified a flaw in the submissions.

Lastly, we address the Director's contention that Cyanamid did not come forth with a study of sufficient duration to warrant granting the supplemental NADA sought.[156] Cyanamid and its experts questioned both the need for long-term studies and the Director's opinion that the Esposito Study was not enough to meet any such need.[157] Given this genuine dispute, we

---

146. *Request for Hearing, supra* note 81, at 53–54, App. 66–67; see also Affidavit of Stanley M. Teeter, D.V.M., at 1–2, App. 208–209.

147. See Affidavit of W. D. Black, *supra* note 86, at 1, App. 154.

148. 21 U.S.C. § 360b(d) (1976), quoted in relevant part in text accompanying note 14 *supra*.

149. See 41 Fed.Reg. 51080–51082, App. 3–5.

150. This was implicitly recognized by the Director. *E.g.*, 41 Fed.Reg. 51082, App. 5.

151. See Affidavit of Clara H. Williams, *supra* note 65; Affidavit of C. Boyd Shaffer, *supra* note 68; Affidavit of James R. Harr, Head of Toxicology Department, Pennwalt Corp., App. 161–178.

152. See note 138 *supra* and accompanying text.

153. See note 138 *supra* and accompanying text.

154. Affidavit of Clara H. Williams *supra* note 65, at 5, App. 146.

155. Affidavit of C. Boyd Shaffer, *supra* note 68, at 1, App. 201.

156. See note 137 *supra* and accompanying text.

157. Affidavit of John A. Farnham, D.V.M., American Cyanamid Co., at 2–3, App. 190–191; Affidavit of C. Boyd Shaffer, *supra* note 68; *Request for Hearing, supra* note 81, at 42–45, App. 55–58.

cannot declare the tests conclusively inadequate under Section 512(d).[158]  Moreover, if the Director were really proposing a different, more stringent standard than that embodied in the statute, his effort must fail because Cyanamid was not afforded timely notice thereof.  Cyanamid submitted its materials in support of OTC marketing of Proban, waited four years, and then was told to present long-term studies within 30 days or its application would be denied.[159]  This is precisely the sort of belated establishment of new requirements that fairness cannot tolerate.[160]

## IV.  CONCLUSION

■ We are loathe to frustrate FDA's effort to weed out meritless requests for NADAs without hearings.  Indeed, we have fully recognized a rather broad area in which FDA may properly enter administrative summary judgment.  Going well beyond *Hynson*,[161] which sanctioned summary dispositions when the filed papers conclusively show a failure to meet one of the precisely specified regulatory requisites to entitlement to the desired administrative decision, we have indicated that summary action may likewise be taken on the basis of manifest noncompliance with general statutory or regulatory provisions,[162] or even on the basis of obvious noncompliance with an undisputed particularization of general statutory mandates, so long as the regulat-

ed party is afforded ample opportunity to question or meet the newly-adopted standards.[163]

As this opinion attests, however, FDA may be well advised to consider promulgating detailed regulations dealing with the sort of data and methodological rigor that it will insist upon before deciding that a drug's safety under the proposed conditions of use has been established.  Absent such regulations, fairness to the regulated party and respect for the limitations on judicial intrusion into areas calling for application of the administrative agency's technical expertness[164] set severe constraints on FDA's authority to dispense with the statutorily-required hearings on new animal drug applications.

■ Cyanamid presented FDA with scientific studies which in the opinion of some experts proved that Proban may be safely used by dog owners without professional supervision.  Cyanamid's experts disputed FDA's interpretation and critique of the studies' results and methods.  They raised, too, a number of material questions about the appropriateness of the methodological standards the Director attempted to graft onto the statute.  In short, the papers on file in this matter generate several material issues of fact and science that FDA attempted to resolve without a hearing, in contravention of Section 512(c).[165]  Accordingly, we reverse the order under review

---

**158.** 21 U.S.C. § 360b(d) (1976).

**159.** See notes 4, 7 *supra.*

**160.** *Hess & Clark, Inc. v. FDA, supra* note 38, 161 U.S.App.D.C. at 403–405, 495 F.2d at 983–985; *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 232, 501 F.2d at 792 (dissenting opinion);  see also note 129 *supra.*

**161.** *Supra* note 24.

**162.** See notes 30–33 *supra* and accompanying text.

**163.** See notes 34–48, 126–132 *supra* and accompanying text.

**164.** "The point is that the methodological complexity of the various medical research issues involved in drug testing should make the courts hesitant in venturing judicial reconstruction of reasoning which FDA omitted, or in supposing, without benefit of any expertise, that the underlying principles of drug testing are so well-settled, widely known and agreed upon that the FDA's conclusory statement of a deficiency reflects a palpable shortfall that does not merit a hearing of any kind."  *Cooper Laboratories, Inc. v. Commissioner, supra* note 16, 163 U.S.App.D.C. at 231–232, 501 F.2d at 792–793 (dissenting opinion);  see also note 117 *supra.*

**165.** 21 U.S.C. § 360b(c) (1976), quoted in note 21 *supra.*

and remand the case to FDA for further proceedings consistent with this opinion.[166]

*So ordered.*

**166.** Cyanamid's experts have provided sufficient logical and scientific support for the view that the submitted tests adequately demonstrated Proban's safety for OTC use to raise an issue of fact. Thus we have no warrant for remanding for a further proceeding to determine whether genuine issues of fact necessitating a hearing are present. Compare *Smithkline Corp. v. FDA, supra* note 22, 190 U.S.App.D.C. at 228–230, 587 F.2d at 1125–1127.